IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOE R. GRASER, | ) | CASE NO. 1:07 cv 1050 |
| | ) | |
| Plaintiff, | ) | JUDGE LIOI |
| | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **REPORT AND RECOMMENDATION** |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule. The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Joe R. Graser's application for Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court recommends the decision of the Commissioner be REVERSED and REMANDED to the Social Security Administration for further proceedings not inconsistent with this Report and Recommendation.

## I.  PROCEDURAL HISTORY

On July 2, 2004, Plaintiff filed an application for Disability Insurance benefits and Supplemental Security Income benefits, alleging a disability onset date of March 24, 2004 due to

limitations related to cirrhosis of the liver, carpal tunnel syndrome, dizziness, leg pain, acid reflux, and a heart attack.  On February 13, 2006, Administrative Law Judge ("ALJ") Barbara Beran determined Plaintiff had the residual functional capacity ("RFC") to perform light work that involved simple repetitive tasks, no functional literacy, no fast-paced tasks, and no complex or detailed tasks and, therefore, was not disabled (Tr. 19). On appeal, Plaintiff claims the ALJ's determination is not supported by substantial evidence.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Born on May 17, 1952 (age 53 at the time of the ALJ's determination), Plaintiff is an "individual closely approaching advanced age."  *See* 20 C.F.R. §§ 404.1563, 416. 963.  Plaintiff last completed the ninth grade and has past relevant work as a factory worker, lumbar sorter, and salvage worker (Tr. 131, 136, 142).

### B. Medical Evidence

In 2003 and 2004, Plaintiff went to the hospital emergency room on several occasions (Tr. 189-217).  In October 2003, emergency room staff diagnosed Plaintiff with hepatitis, jaundice, and hepatosplenomegaly (Tr. 195, 201).  The emergency room records in January and March 2004 refer to Plaintiff's daily alcohol intake (Tr. 202-03, 209).

In January 2004, Plaintiff went to Victor Velasquez, M.D., at the Cleveland Clinic in Wooster, Ohio for treatment of a cough and respiratory infection (Tr. 252).  Dr. Reynolds noted that Plaintiff had been prescribed antibiotics, which were helping his bronchitis to resolve (Id.). In March 2004, David Reynolds, M.D., saw Plaintiff for alcoholic liver disease and jaundice (Tr. 251).  Dr. Reynolds encouraged Plaintiff to discontinue alcohol consumption and attend

Alcoholics Anonymous meetings (Id.).  In April 2004, Plaintiff went to Dr. Reynolds for follow-up of alcohol withdrawal symptoms, which included nausea and vomiting (Tr. 250).   Dr. Reynolds prescribed some medications for Plaintiff's symptoms (Id.).

In August 2004, Sushil M. Sethi, M.D., examined Plaintiff and evaluated his physical condition (Tr. 218-26).  Plaintiff complained to Dr. Sethi of back pain from a remote injury that he claimed limited his ability to lift heavy objects and to sit or walk for prolonged periods (Tr. 218).  Dr. Sethi found that Plaintiff had a normal gait, normal strength, normal reflexes, and normal sensory responses (Tr. 220, 223).  Plaintiff could not squat or walk on his heals or toes (Tr. 220).  He showed mild osteoarthritis of the lumbosacral spine and limited ranges of back motion (Tr. 220, 224-25).  Plaintiff had some expiratory wheezes and rhonchi on examination, and a chest x-ray showed some hyperinflation (Tr. 219-20).  Dr. Sethi concluded that Plaintiff was "somewhat limited" in his ability to stand, walk, lift, and carry (Tr. 220-21).  Also in August 2004, Plaintiff went to the Cleveland Clinic for treatment of alcohol abuse and  related polyneuropathy (Tr. 285).  Dr. Reynolds noted that Plaintiff had a remarkable improvement in his appearance since his last visit (Id.).

In September 2004, Curt S. Ickes, Ph.D., an examining psychologist, evaluated Plaintiff's mental condition (Tr. 227-30).  Plaintiff told Dr. Ickes that he had been sober for nine months (Tr. 227).  Plaintiff demonstrated a decreased pace and some difficulty with self-expression (Tr. 228).  Plaintiff had limited memory, vocabulary, math, social reasoning, and motor-perception skills (Id.).  Plaintiff had difficulty interpreting proverbs, could not perform serial seven calculations, and displayed poor insight and judgment (Id.).  Dr. Ickes conducted intelligence testing of Plaintiff (Tr. 229).  A Wechsler Adult Intelligence Scale III (WAIS-III) showed that

Plaintiff had a verbal IQ of 66, a performance IQ of 68, and a full scale IQ of 64 (Id.).  His memory IQ was commensurate at 65 (Id.).  Plaintiff demonstrated an ability to read at the second grade level (Tr. 230).  Dr. Ickes noted impressions of alcohol dependence which was reportedly in remission, and mild mental retardation (Id.).  Dr. Ickes concluded that Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks and his ability to understand, remember and follow instructions would likely be markedly impaired due to the level of cognitive functioning (Id.).

In December 2004, state agency physician Denise A. Kohler, Ph.D., reviewed Plaintiff's file and concluded Plaintiff had mild limitations in restriction of activities of daily living, mild difficulty in maintaining social functioning, marked difficulty in maintaining concentration, persistence or pace, and no episodes of decompensation (Tr. 242).

In February 2005, Plaintiff went to John K. Miller, M.D., at the Viola Startzman Free Clinic, for complaints of swallowing problems and a left arm injury (Tr. 254).  Plaintiff also told Dr. Miller that his legs gave out (Id.).  Dr. Miller encouraged Plaintiff to exercise four to five days a week (Id.).  In April 2005, Dr. Miller wrote that Plaintiff was "currently disabled" due to leg pain problems (Tr. 253).  Dr. Miller stated that Plaintiff was being treated and evaluated further, but it was uncertain whether he had a chronic, permanent problem (Id.).

In April 2005, Perry Williams, M.D., examined Plaintiff for the local welfare department (Tr. 256-57).  Dr. Williams found that Plaintiff could stand and walk for up to four hours a day, sit without limitation, and lift and carry up to 25 pounds (Tr. 257).  Dr. Williams indicated Plaintiff was employable with restrictions (Id.).

In April 2005, John A. Comley, Psy.D., a psychologist, evaluated Plaintiff for the local welfare department (Tr. 258-64).   Dr. Comley characterized Plaintiff as alert, polite, and cooperative, but also passive, dependent, withdrawn and tired (Tr. 259).   Intelligence testing (WAIS-III) revealed a full scale IQ of 70, a verbal IQ of 65, and a performance IQ of 83 (Tr. 260).   Dr. Comley believed that these scores might underestimate Plaintiff's intellectual functioning because of "interference from nonintellective factors" (Id.).  Dr. Comley opined that a learning disability reduced Plaintiff's functioning and if this interference could be eliminated, Plaintiff would be capable of performing in the borderline range (Id.).  Plaintiff demonstrated an ability to read at the second grade level (Tr. 262).  Dr. Comley diagnosed borderline intellectual functioning, alcohol dependency with underlying depression, in remission, and an adjustment disorder, unspecified, with depressed mood (Tr. 261).

From March 2005 to August 2005, Plaintiff went to the Viola Startzman Free Clinic for treatment of back and leg pain (Tr. 265-84).   In August 2005, lumbar x-rays showed mild spurring in the spine (Tr. 276).

### C. Additional Evidence

Plaintiff's school records showed that his poor performance and home life accounted for his school failure (Tr. 107).  He was held back in first grade because of "uncalled for absence" and "too many days of absence to merit passing or placing in grade 2" (Id.).  According to his second grade teacher, Plaintiff "passed, but [was] still a poor reader, [and] could be a good student with help from home" (Id.).  By fourth grade, Plaintiff's attendance had greatly improved, but his absences in previous years had put him at a disadvantage, and he lacked the necessary background to successfully do fourth grade work (Id.).  In fifth, sixth, seventh, and

eighth grade, he had many absences that led to failure in school (Id.).  In fifth grade, a Henman-Nelson test of mental ability showed that Plaintiff had an IQ of 68 (Tr. 108).  In sixth grade, Plaintiff underwent intelligence testing, including a Peabody Picture Vocabulary test, which showed he had an IQ of 78 (Tr. 111).  In seventh grade, Plaintiff had an IQ of 66 (Tr. 108).

### D.  Hearing Testimony

At the hearing, Plaintiff testified that his pain is primarily in his legs and that walking makes the pain feel worse (Tr. 52).  He can only walk about three blocks before he is in pain (Id.).  He has used a TENS unit on his back, but the effect only lasts an hour after he uses it (Tr. 53).  He can do household chores, such as wash dishes or make his own supper (Tr. 58).  Plaintiff does not write any letters or correspondence (Tr. 60).  He tries to read a motorcycle magazine, but cannot read enough to understand what it means (Tr. 65-66).

Vocational expert ("VE") Carl Hartung testified at Plaintiff's hearing (Tr. 66).  The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, and vocational background, who retained the residual functional capacity ("RFC") to perform work that involved lifting and carrying up to 25 pounds, no more than occasional bending, and simple tasks, and did not require functional literacy, fast-paced tasks, or complex detailed tasks (Tr. 67-68).  The VE responded that such an individual would be capable of performing the jobs of machine feeder and offbearer (39,790 jobs in the national economy), packing and filling machine operator and tender (50,085 jobs in the national economy), and hand cutter and trimmer (30,110 jobs in the national economy) (Tr. 70).

### III.  **DISABILITY STANDARD**

A claimant is entitled to receive Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20. C.F.R. §§ 404.1505, 416.905.

### IV.  **STANDARD OF REVIEW**

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* Indeed, the Commissioner's determination, if supported by substantial evidence, must stand, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V.  ANALYSIS

### A.  The ALJ's Determination Plaintiff is Not "Illiterate" Under the Regulations

Plaintiff contends the ALJ's determination that Plaintiff does not meet the regulatory definition of "illiteracy" is not supported by substantial evidence.  According to Plaintiff, he is illiterate as defined by 20 C.F.R. §§ 404.1564 and 416.964 and Sixth Circuit case law, and since he is closely approaching advanced age and unable to return to his past unskilled work, the Grids direct a finding of disability.  The Commissioner contends the ALJ reasonably concluded Plaintiff's reading skills and education level are consistent with a limited education, rather than the regulatory definition of illiteracy, for the purposes of the vocational factors.  The Magistrate Judge finds the ALJ's determination that Plaintiff did not meet to the regulatory definition of "illiteracy" is not supported by substantial evidence.

The social security regulations provide the following definition for "illiteracy":

Illiteracy means the inability to read or write.  We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling.

20 C.F.R. §§ 404.1564(b)(1) and 416.964(b)(1).  The ALJ concluded Plaintiff is functionally illiterate, but because he has a limited ninth grade education and retains the ability to read and

8

write a simple message, he is not illiterate within the meaning of 20 C.F.R. §§ 404.1564(b)(1) and 416.964(b)(1).

The Sixth Circuit addressed the issue of illiteracy in *Skinner v. Secretary*, 902 F.2d at 447 (6th Cir. 1990). In that case, the claimant challenged the district court's finding that there was substantial evidence to support the ALJ's determination the claimant received a marginal education and therefore, was not illiterate. *Id.* The evidence in *Skinner* showed the claimant could not read a newspaper, was administered the written portion of his driving test orally, had limited math skills, read below the third grade level, and had never had a job that required reading or writing. *Id.* at 448-49. A rehabilitation counselor concluded the claimant was functionally illiterate and "beyond reading a simple sign, which he might be familiar with, [Mr. Skinner] could not be expected to properly decode written material. . . . Even his ability to accurately handle change is quite questionable." *Id.* at 449. Although the ALJ relied on the fact that the claimant completed the eighth grade, the evidence showed he actually completed about three grades. *Id.* at 450. Based upon these facts, the court in *Skinner* concluded the ALJ had erroneously concluded the claimant possessed a marginal education. *Id.* The court noted that numerical grade level is properly used to determine educational abilities only if contradictory evidence does not exist, and also, that the record was replete with evidence the claimant was illiterate. *Id.* at 450-51.

The facts in this case are similar, but less conclusive, than the facts in *Skinner*. The ALJ concluded Plaintiff has a limited education because he completed the ninth grade. However, the evidence shows Plaintiff was merely placed from grade to grade, except for the first grade, which he passed on his third try. The ALJ concluded Plaintiff retains the ability to read and

9

write a simple message, however, the evidence upon which she bases her conclusion is not clear.
For example, Plaintiff testified he tries to read a motorcycle magazine, but cannot read enough to
understand what it means (Tr. 66).  The fact that Plaintiff reads below the third grade level is not
contested, and Plaintiff testified that it has been years since he has read a book, which would
have been at the first or second grade level (Id.).  The ALJ asked Plaintiff if he does "puzzles of
any kind, crossword, word search, jigsaw puzzles, anything like that?" (Tr. 60).  Plaintiff replied,
"Not now, but I used to" (Id.).   This response does not indicate whether or not Plaintiff
completed puzzles that actually required any reading or writing.  The ALJ also asked Plaintiff if
he writes any "letters, correspondence, e-mail, anything like that?" (Tr. 60).  Plaintiff replied that
he did not. (Id.).  Plaintiff's counsel asked him whether he was given a written or oral test when
he received his driver's license and the ALJ interrupted, saying "You don't have to pursue this
line of questioning" (Tr. 66).   In response to this statement, Plaintiff's counsel ceased
questioning him.

　　　　Nothing in the foregoing, including Plaintiff's educational history and past completion of
"puzzles of any kind," establishes on its face that Plaintiff is actually able to read and write a
simple message, nor does the ALJ make specific her reasons for reaching that conclusion.  When
Plaintiff's counsel tried to further explore this issue during questioning at the hearing, he was
prevented from doing so by the ALJ, without explanation.  Given that if found to be illiterate
under the regulations, the Grids direct a finding of disabled, the ALJ erred by not permitting
counsel to pursue this line of questioning or by failing to explain why such questions were
rejected.  Accordingly, the Magistrate Judge concludes the ALJ's determination that Plaintff
does not meet the regulatory definition of "illiteracy" under  20 C.F.R. §§ 404.1564(b)(1) and

416.964(b)(1) is not supported by substantial evidence.  On remand the ALJ should allow Plaintiff's counsel to pursue such questioning or explain why such evidence is not relevant to a determination of Plaintiff's literacy under the regulations.

### B.  The ALJ's Determination Plaintiff Did Not Meet or Equal a Listed Impairment

Plaintiff next contends substantial evidence does not support the ALJ's determination that he did not meet or equal a listed impairment.  The ALJ determined Plaintiff did not satisfy the C criteria for Listing § 12.05 (Tr. 18-19).  According to Plaintiff, in so concluding, the ALJ erroneously found that Plaintiff does not have significant deficits in adaptive functioning as required by Listing § 12.05C, and relied upon the incorrect IQ score.

The diagnostic description for Listing § 12.05C is as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> * * *

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional significant work-related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  Essentially, Listing § 12.05C requires a claimant to make three showings: "(1) he experiences significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the developmental period (i.e., the diagnostic description); (2) he has a valid verbal, performance, or full scale IQ of 60 through 70; and (3) he suffers from a physical or other mental impairment imposing an additional and significant work-related limitation of function." *West v. Commissioner of Soc. Sec.*, 240 Fed. Appx. 696, 697-98 (6th Cir. 2007) (quoting 20 C.F.R. Pt.

404. Subpt. P, App. 1, § 12.05C) (internal quotations omitted).  *See also Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001).  The ALJ concluded Plaintiff did not demonstrate deficits in adaptive functioning, and did not satisfy the diagnostic description of mental retardation because he did not produce a reliable qualifying IQ score before the age of 22.

The ALJ concluded the record as a whole supported a conclusion that Plaintiff does not have the significant deficits in adaptive functioning required by Listing § 12.05C (Tr. 18).  In support of this conclusion, the ALJ cited Plaintiff's lengthy work history, adequate interpersonal skills, and, his ability to communicate his needs and wants effectively, use community resources, and operate a household (Id.)  The ALJ noted that although Plaintiff's functional academic skills are limited, he was able to function in a competitive economy for an extensive period (Id.).

Plaintiff argues the ALJ's determination that he does not have deficits in adaptive functioning relies primarily on his work history and ability to go to the grocery store and perform chores.  Plaintiff argues *Brown v. Secretary of Health & Human Servs.*, 948 F.2d 268 (6th Cir. 1991) supports a finding that Plaintiff's ability to complete these tasks is not inconsistent with mild mental retardation.  In *Brown*, the court found the claimant's ability to work as a truck driver and record mileage and hours worked, use public transit, visit friends, make change at a grocery store, do laundry, clean his room, and obtain a driver's license, was not inconsistent with a valid IQ score of 68. *Brown*, 948 F.2d at 269.  Plaintiff also argues that his case is distinguishable from the case in *Foster*, 279 F.3d 348, (6th Cir. 2001), in which the court concluded the evidence did not demonstrate an onset of deficits in adaptive functioning before age 22.  In *Foster*, the court concluded the claimant's prior work as an accounting clerk at

a bank and a liquor store demonstrated that she had the ability to perform relatively complicated tasks. *Id.* at 355.

The Magistrate Judge acknowledges that Plaintiff raises valid points under *Brown* and *Foster*, however, a review of the ALJ's decision reflects that he did not rest his conclusion regarding Plaintiff's adaptive functioning on Plaintiff's past work history and ability to go to the grocery store and perform chores alone. "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West*, 240 Fed. Appx. at 698 (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993).  The ALJ concluded Plaintiff has no limitations in activities of daily living because he performs chores, cares for his own personal hygiene and grooming, drives, prepares food, washes dishes, does laundry, grocery shops, handles his own money, and has participated in computer training at Goodwill (Tr. 17). The ALJ concluded Plaintiff has only mild restriction in social functioning because although Plaintiff has complained of depression and involvement with people, he has always been described as pleasant, friendly, cooperative, and polite (Id.).  Plaintiff has also lived with his nephew, niece, ex-wife, and two adult sons without difficulty, has dated in the recent past, and was going to AA on a regular basis (Id.).  The ALJ's assessment of Plaintiff's ability to maintain social functioning is consistent with the record opinions of Drs. Kohler, Ickes, and Comley (Tr. 17, 230, 242, 263).  The ALJ concluded Plaintiff has moderate limitations in concentration because Plaintiff has good motivation, but is inefficient in his work and easily distracted, has periods of confusion and slowed thinking, and has some impairment in immediate memory (Tr. 17).  Thus, in assessing Plaintiff's adaptive functioning, the ALJ thoroughly considered Plaintiff's effectiveness in the areas of daily living skills, social skills, communication, and

concentration, and determined the evidence did not support a conclusion that Plaintiff has significant deficits in adaptive functioning.

Based on the above, the Magistrate Judge concludes there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff does not have significant deficits in adaptive functioning, and thus does not meet or equal Listing § 12.05C.

Plaintiff also contends substantial evidence does not support the ALJ's determination that he did not meet or equal a listed impairment because the ALJ relied upon the incorrect IQ score. The ALJ concluded Plaintiff did not satisfy the diagnostic description of mental retardation because he did not produce a reliable qualifying IQ score before the age of 22.  The ALJ noted that Plaintiff obtained an IQ score of 68 at the age of 12 and an IQ score of 78 at age 14.  The ALJ next quoted the preface of section 112.00D(10), which provides:

> Generally, the results of IQ tests tend to stabilize by age 16.  Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior.  IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above.  IQ test results obtained before age 7 are current for 2 years if tested IQ is less than 40 and 1 year if at 40 or above.

In reliance upon this quoted section, the ALJ concluded, "As such, the IQ result of 68 should not be considered as a valid indicator of Plaintiff's functioning after age 16, since the test at age 14 (FSIQ 78) is a more reliable indicator of functioning prior to attaining age 18" (Tr. 19). However, the record reflects that Plaintiff was tested not two, but three, times prior to turning age 18.  Plaintiff was first tested in May 1964 while he was in the 5th grade and 12 and one half years old, and the testing resulted in an IQ score of 64 (Tr. 108).  Plaintiff was next tested in May 1966 while he was in the 6th grade and 14 years old, and the testing resulted in an IQ score

14

of 79 (Tr. 110).  Plaintiff was again tested in November 1966 while he was in the 7th grade and was 14 and one half years old, and testing resulted in an IQ score of 66 (Tr. 108).  The ALJ's opinion reflects that she either missed or ignored the fact that Plaintiff tested at age 14 and one half years, and results showed an IQ of 66.  Using the ALJ's logic, it appears the IQ score of 66, which was most recent in time to when Plaintiff attained age 16, should be considered the most reliable indicator of Plaintiff's functioning prior to attaining age 18.  It is unclear whether the ALJ considered Plaintiff's IQ score of 66 from November 1966 and why the ALJ failed to address this IQ score in her written decision.

An ALJ has a duty to consider the record as a whole. *See Hurst v. Secretary of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (failing to consider the record as a whole undermines the ALJ's decision).  Indeed, and ALJ cannot simply "pick and choose" evidence in the record, "relying on some and ignoring others, without offering some rationale for his decision." *Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).  The IQ score of 66 is a qualifying score obtained before the age of 18 for the purposes of Listing § 12.05C.  However, because the Magistrate Judge concluded substantial evidence supports the ALJ's determination that Plaintiff does not have the significant deficits in adaptive functioning required to meet or equal Listing § 12.05C, the ALJ's failure to address this IQ score from November 1966 is, at most, harmless error.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner that Plaintiff was not disabled is not supported by substantial evidence.  Accordingly, the Court recommends the decision of the Commissioner be REVERSED and REMANDED to the Social Security Administration for further proceedings not inconsistent with this Report and Recommendation.

                                    s/ Kenneth S. McHargh
                                    Kenneth S. McHargh
                                    United States Magistrate Judge


Date: January 31, 2008

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).

16